The United States Court of Appeals with an executive is now in session. Good morning, ladies and gentlemen. We have one case on the calendar for this morning, and it is a weighty one, and so we will – we understand that counsel are prepared to give their argument and we will listen attentively. The case is Shad v. Schriro. I don't – we haven't changed any of the names on these yet, but for this purpose it's Shad v. Schriro. May it please the Court. My name is Kelly Henry, and together with Denise Young, it's my privilege today to represent the appellant in this case at Shad. I would like to reserve 5 minutes of my time for rebuttal. Your Honors, even though this case presents numerous substantial issues of constitutional error, any one of which we believe would justify this Court's grant of habeas relief, this morning I would like to first address my comments as to why we believe that Mr. Shad is entitled to have his unconstitutional death sentence set aside based on the precedent from the United States Supreme Court all the way from Lockett to Abdul Kabir v. Quarterman, as well as this Court's binding decision in Stiers v. Schriro. Second, and relatedly, I would then like to address why, at the very least, this Court should remand this case to the District Court for an evidentiary hearing on Mr. Shad's claim that he received ineffective assistance of counsel in mitigation pursuant to this Court's decision in Lambright, as well as the United States Supreme Court's decision from Strickland to Wiggins to Williams, both Terry and Michael, as well as Ronpilla, as well as this Court's decision in Belmontese v. Ayers. And then finally, time permitting, I would like to address why it is that this Court should set aside the conviction in this case because of the prosecutor's misconduct in supporting false testimony before the jury in 1985 through the snitch John Duncan's testimony, and also because of the Brady violation that occurred at that time. We believe that the only issue there was with respect to materiality, and again, at the very least, we would be entitled to a remand for an evidentiary hearing for the Court to make fact findings related to that claim. If I may turn now to our first issue, and that is the Arizona Supreme Court's unconstitutional constitutional relevance test. In Tenard v. Dredge, the United States Supreme Court held that since Lockett, the Court has never permitted a screening test similar to the Fifth Circuit's test, which they termed a constitutional relevance test. Ginsburg I understand the legal argument, but I don't quite follow the factual predicate for it, because neither the trial court nor the Arizona Supreme Court in this case applied or even appeared to apply any kind of screening or relevance test or nexus test. So I don't, I guess I'm having difficulty following how that plays out in this case. I think that we know that the, I know we know that the Court applied the constitutional relevance test, both at the trial court level and at the Arizona Supreme Court level, for the following reasons, Your Honor. First, in post-conviction at ER 317, or 319, excuse me, the Attorney General argued to the trial, to the post-conviction judge, who was the sentencing judge in this case, against the merits in effective assistance of counsel claim with respect to tribal childhood, because he reminded the Court that Arizona law required, required a causal connection between the two. It requires or required? Required. It no longer requires since the statute changed. No, no, but at the time, the post-conviction hearing when the Attorney General argued that it, did he say required at the time of trial, or did he say requires in the present sentence? Here's exactly what he said. With respect to defendant's allegations of child abuse, it should be noted that before such evidence is considered mitigating, the burden is on the defendant to establish that it had direct effect on his conduct at the time he murdered Larry Grove, and then he provides a page-long stringing cite to the court, the sentencing judge. And were any of those cases that he cited cases that predated the trial? I don't believe that his cases predate the trial, Your Honor, but State v. Wallace, which was decided prior to the decision of the Arizona Supreme Court in this case, held, and we cited it in our briefs, that Arizona law requires, and they did use the word, requires, a connection between the offered evidence of mitigation and the crime before it may consider mitigation. You know, that seems to me to be a requirement in the air, because, I mean, unless you can point to me, and I can't see it, in the trial judge's sentence or in the Arizona Supreme Court's, any of their decisions, any hint of a nexus requirement. I mean, it's just not there. So are we supposed to be influenced by this requirement that just exists in the air, in the desert? No, Your Honor. I would refer you to the Court's special verdict, where in the special verdict, the Court said, and you have to look at the special verdict in context, just as this Court did in Stiers. First, in the special verdict, the Court noted, and that is at page 186 of our excerpt of record, Your Honor, at the top, the Court talks about the – I'm sorry, page 187 at the top of the page. The Court refers to the mitigating circumstance in the context of the, quote, time pertinent in this case. Time pertinent in this case, when read in the context of Arizona law, establishes exactly what we were talking about here with the constitutional screen test. But moreover – On a different planet, I suppose. I just don't see it in the decision. They consider – the trial judge considered all of the mitigating circumstances and made a conclusion based upon all of them, never once suggesting that he was screening out some considerate, some proffered mitigating circumstance on relevance grounds. Your Honor, I would respectfully disagree. With respect – when the Court in his special verdict went through each of the mitigating circumstances, when he got to troubled childhood, the Court said the Court does not consider unfortunate childhood a persuasive mitigating circumstance in this case. Now, persuasive. Not that he didn't consider it because it wasn't relevant. And I guess, Your Honor, that's where I'm going to disagree, and I believe that the over 14 years of litigation. Well, that goes – excuse me for interrupting, but that goes – I'd like you to move on to your next point, but I just wanted to say what's troubling me here is that the – that goes to whether or not it was applied. And even if we assume that it was in the back of their heads, we have to somehow show that it had a real effect, that there was a cause and effect here. And I'm not sure that I can see that. And I guess that's where I was pointing the Court back to the post-conviction proceedings, when, again, we're talking – when the post-conviction court – and it will lead into my second point. But before I get to that point, I did want to, again, mention the United States Supreme Court case of Bell v. Cohn, because it addresses Judge Reimer's concerns about what the Arizona Supreme Court said and didn't say in their opinion on this  And they said two things. First of all, they said, we don't care what the Ninth Circuit Court of Appeals tells us about our death penalty statute. We're going to keep applying our law the way we apply our law in this case, they said that, until the U.S. Supreme Court tells us differently. Second, they didn't discuss the mitigation of troubled childhood. And Bell v. Cohn, the second Bell v. Cohn, not the third one that just came out, but Bell v. Cohn, the second case, says that the Court has to presume that the state appellate court applied its own precedent when it was considering the evidence when it is silent on the record. And here it is silent. Yeah, but it's a stretch to say we have to presume that they applied it and that it had the effect of excluding their, of their not giving any weight or excluding mitigation evidence when they didn't say that, and that's not apparent in the record. It is, I believe, apparent from the record in the context when you consider the post-conviction. All right. Your Honor, when you go to the post-conviction case and when the ineffective assistance of counsel claim was made to the sentencing judge, so it's the same judge hearing the same evidence, it got past a finding of procedural default. It went to a merits decision. And when the attorney general, who was the same attorney general in this case in the district court, was arguing against the merits of the claim and why further factual development in Mr. Shadd's troubled childhood was not to be allowed, he argued this wouldn't have made a difference to you, Your Honor, at sentencing. Okay. Because the law at sentencing was that there had to be a causal connection. And then they cited all of these cases about the requirement as if all the parties in the post-conviction understood. Okay. We take your point. I think you should move on to your next point on the evidentiary hearing. Thank you, Your Honor. With respect to our ineffective assistance of counsel claim, Your Honor, the State has argued that we failed to develop this claim in State court. Respectfully, we did not. This Court's decision in Lambright v. Shiro initially governs the district court's decision on this case. The district court in this case at ER 75 made the exact same finding that the other Arizona district court made in the Lambright case, that the evidence of mitigation that Mr. Shadd offered was not admissible because there was no causal connection shown between the evidence of the troubled childhood and the crime. And so the district court held that the trial judge wouldn't have considered the evidence at the time of the trial. Thus, counsel was ineffective. Could not have been ineffective. We disagree with that holding for a number of reasons, but not the least of which is Lambright v. Shiro says that's wrong and you have to reverse. In this case, Lambright had an evidentiary hearing. We never had an evidentiary hearing. And we didn't have an evidentiary hearing because we were denied on the merits in post-conviction. Now, there's a lot of discussion in the State's briefs about the post-conviction proceedings and what happened there. But, in fact, the post-conviction court found that the delays in the development of the record in State post-conviction were due to extraordinary circumstances. And then once counsel was able to finally get a mitigation expert appointed, she complied with Arizona law. She filed an affidavit in support of her petition for post-conviction. She laid out the errors and omissions in the trial attorney's investigation of the case and then explained why she needed additional time, additional funds to gather records and to conduct in-person interviews of the client's family. Let me ask you this. Assuming that everything that is now known was known then, that is, you have the results of the mitigation issue, you have Shapiro's, whatever his name was. I've forgotten. The guy begins with an S. Expert opinion. You have the sister's testimony. You have what the mother said. What does that add to the equation? I mean, it doesn't. It just simply shows that he had a really abusive and traumatic childhood, which was known anyway. And to the extent that it shows anything beyond that, it would have undermined the rather compelling case that was, in fact, put on, that this guy is really a valuable member of his community. Your Honor, if I may take your points in reverse. First, it would not have undermined counsel's strategy. Second, there has been no strategy. I mean, there's never been a finding about what trial counsel's strategy was. We know what he presented. He presented a case showing, as I said, to me it was rather compelling that this guy has really is valuable and valued by a number of people both within the prison community and within the Arizona community surrounding the prison, his church, et cetera. And he's done a lot to the education, blah, blah, blah. Okay. So we know what his case was. His case was also, Your Honor, as the district court found in ER-62 to present Mr. Shad's troubled childhood, as he did, in fact, try to do. And, in fact, the evidence that you've discussed, which is compelling, is made even more so when you consider what it is in Mr. Shad's life he had to overcome, which the trial lawyer did not present, effective in the PSR. Well, is it a lawyer? Does a lawyer satisfy his constitutional duty to investigate when he accepts a PSR from the State or from public officials instead of going out and then investigating a case? Actually, can he make an informed, intelligent decision under the law if he fails to conduct an investigation? Absolutely not, Your Honor, as you held in Lambright v. Shiro and also in Battles of the Spurs. I thought I read that somewhere. And, in fact, in Lambright, what this court held, and the cert was denied on that, was that counsel's obligations to investigate are not delegable to a third party. And, in fact, when you look at the pre-sentence report, Your Honor, it is not written in a way that is any way compelling or sensitive to Mr. Shad. Yes, there are two pages that discuss his troubled childhood, but there's no discussion about how his mother watched him be beaten by his father, slapped across the face. Well, that goes to trauma on his mother. I mean, it doesn't shed any light on him. Well, the trauma to his mother actually affected him, Your Honor, because the trauma to his mother caused her to neglect him. The problem is you didn't have Judge Reimer in the State court, because she found all this so compelling. She never would have imposed the sentence. Actually, you're right. Well, he did, didn't he? He did put on the lawyer put on a psychiatrist who touched on this, but never did he ever ask for a psychological evaluation of the defendant? There's no evidence of that in the record, Your Honor. And although Dr. Bentheim did offer some testimony. He said he had a miserable childhood. He said he had a miserable childhood. He also had incorrect facts. So he told the judge that Mr. Shad had moved from pillar to foster home, which wasn't true. So his credibility was undermined in the eyes of the court when he basically didn't have all the facts right. And it's the trial lawyer's job when he sees, as what this court in Velmontese v. Ayers discussed, the tantalizing detail. Like the Supreme Court recognized in Rompilla, he has an obligation then to go out and investigate and not pick up the telephone and call. When you have a client who tells you the last time I saw my mother was in 1978 when she was drunk and kicked me out of the house, this is not someone you can expect to pick up the phone and have her tell you all the family secrets when she doesn't even know who you are. I mean, we didn't have caller ID in 1979 or 1985. And when Mrs. Hughes was finally interviewed in person, what she said was, I was never contacted. And if I had been contacted, I would have cooperated, I would have come to Arizona, I would have testified to all these things. We would have had Dorothy Cole who could have come to testify about the abuse and provided a much broader, much more compelling view of who Mr. Shadd was and how it was that he came to stand before the court, a man convicted before of a previous murder, a man who doesn't deserve the death penalty. This wasn't a death penalty case to begin with. And even though the trial lawyer did some things, the United States Supreme Court and this Court has held that's not enough. He has to do what the ABA guidelines required him to do, which was a thorough investigation. And that did not happen here. Finally, Your Honors, with respect to the Brady violence, well, actually, I think it's really important that we do discuss, I'm sorry, the allegations that we failed to develop in state court because that is the crux of the State's argument. If we didn't fail to develop in state court, then a remand for an evidentiary hearing, I believe, is quite clear on this record. And we did not fail to develop. Because? Because we complied. Mr. Shadd's lawyer complied with the Arizona requirements. And the finding of the post-conviction court was not that Mr. Shadd had failed to comply with any state procedural rule. It was that Mr. Shadd's claim failed on the merits. And that decision picked up the language of fishing expedition, which came from the State's brief, the same brief I was discussing earlier, where the State argued to the sentencing judge, they're not entitled to develop this claim because you can't consider it because there's no causal connection. So the post-conviction court, even if you don't believe the sentencing court did it, the post-conviction court made the exact same error that the district court here made, that this court has held unconstitutional under Lambright. That was the reason that Mr. Shadd was not able to further develop. He presented an affidavit from an expert. The State refers to Ms. Wake as an expert in their brief. She was, in fact, a mitigation expert. She reviewed trial counsel's files. She detailed his omissions. She interviewed Mr. Shadd. She ran out of money. She doesn't have the ability to just travel all over the country without authorization from the court. And so they presented the affidavit to the court. The State opposed, not on grounds of there being insufficient evidence under a procedural rule, but insufficient evidence of prejudice because of what the Arizona requirements were. And it was that motion that was granted. Then additional affidavits were provided, and the petition for rehearing was denied. So Mr. Shadd did not fail to develop because he is not to blame for not presenting this evidence. If he had been given the evidence you're hearing, he was entitled to. He would have had the funding to get the experts. The other thing Ms. Wake asked the court for was an independent psychiatric evaluation. That was one of the recommendations in order to fairly present the case. And the court said, I don't need to hear any more. I've already heard this. And he was wrong. He hadn't. But, again, he was applying this unconstitutional constitutional relevance test that was rejected by the court in Tenard and this court in Lambright. Finally, with respect to our NAPU and Brady claim, I would like to first address Yes, ma'am. Oh, go ahead. I was just sighing. Oh. Me too. With respect to our NAPU claim, Your Honor, first of all, the State alleges that we failed to raise a NAPU claim in our amended petitioner in the lower court.  And I would also point the Court to the Are you talking about the NAPU claim? Yes, ma'am. Other than the Brady claim. Yes, ma'am. And in the amended petition for habeas corpus, we did in fact cite to Giglio, which involved both NAPU claims and Brady claims. So this the NAPU claim was indeed fairly presented in the court below and is properly before this Court on appeal. Now, the State makes an argument for the first time on appeal that there's somehow a default with respect to this claim. Respectfully, we believe that their initial concession in the district court that this claim was indeed properly or is indeed preserved was in fact the correct claim for two reasons. First, really Banks answers the question. The State hid the evidence. There's no way that Mr. Shadd could have gotten this evidence in State court. By happenstance, he found one letter in State court, and the very day he discovered it, he presented it to the State court judge who chose not to hear it. It was the first evidentiary hearing in September 25th, I think it was, 1979. Duncan said that he knew about Halterman's letter from the event, from his court proceeding. So it was out there from day one. Nobody followed up on it. Do you have any insight about that? My insight is that's why we need an evidentiary hearing, because the question about whether or not the letter was out there, I mean, it was known. He equivocates, and Halterman equivocates about what help he gave. Maybe I did, maybe I don't. Maybe he asked for it, maybe I didn't. No, but Duncan said at that evidentiary hearing, I found out about the letter not from Halterman, I found out about it from my court proceeding. Right. Which he then denied in 1985. Well, yes. And not corrected by the prosecutor. And nobody used that transcript, although he walked, Shaw walked around the edges of it, nobody used the transcript to refresh his recollection or as a prior inconsistent statement, either one. But never mind that if you don't have a clear answer. Let me just ask this. What are the claims that you, excuse me, what is the testimony that you assert is subject to the nephew? To the nephew violation? First, his claim that in 1979 he didn't receive any special treatment from behalf on, from Janes. Second. Yes, but what we're looking at is the 1985 trial. So what are the statements that are made in the 1985 trial that you say are subject to nephew? There are three, Your Honor, in the 1985 trial. And I would cite the court to Jackson v. Brown in support of our prejudice here. No doubt. I just. First, first. The first evidence is his testimony, his false testimony to bolster his credibility that he left Arizona in 1978 to go to California to turn himself in. That was false testimony. He didn't turn himself in. He had to be arrested a month after he left Arizona. Second. He testified in the 1985 trial again to bolster his credibility in front of the 1985 jury that he received no special treatment when he cooperated with the government in 1978 and 1979. That was false. Third. We believe, there's reason to believe that his testimony that he didn't receive lenient treatment in 1985 is suspect from the pre-sentence report or the criminal records that we had access to. We don't get NCIC, obviously. But I can't find where he ever got a sentence for his petty theft charge out of California that was pending at the time he testified in 1985. Now, what the court said in Jackson v. Brown and what Nepu cases talk about and other cases talk about is when the lie is to bolster the credibility of the witness, then there's a double prejudice. Because not only did he lie to make himself look like he was just a good, reformed Christian who wanted to help haltermen who had been nice to him, but it would have reversed that and shown that he had just lied to the jury and that the prosecutor let him lie to a jury in 1979 the month he didn't correct it and let him lie again to the jury in 1985. And just as in Kiles, that would have undermined the credibility of the entire prosecution's case. Now, the Attorney General argues that Mr. Duncan was not important to this case. But, in fact, he was. The statement that he claims Shad made to him in the jail is characterized by the fact that the Arizona Supreme Court has the most incriminating statement by Shad. It's the statement that the State relies on. The most incriminating statement by Shad? Yes. Duncan's statement? Duncan's statement that Shad said. That he said, I'll deny being and having been in Arizona, is the most? Is the most incriminating statement from Shad. And that the Arizona Supreme Court said that after which trial? After the 1985 trial. Okay. And in so doing, Your Honor, what they said they and the reason it was most incriminating is because this is such a circumstantial case. Because there is no evidence that places Mr. Shad at the crime scene in Prescott where Mr. Grove was killed and his body laid. There's no evidence of that. They had to rely on Duncan to get Mr. Shad in Arizona at least. Oh, come on. His Ford is found in Arizona. It's found with three newspapers from July 31st from the Phoenix area. And the next day he uses Grove's credit card in Benson, Arizona. I mean, he is put in Arizona. He's not put in Prescott. That's true. Let me just ask you one question, then perhaps you want to save some time for rebuttal. You said that if this information had been known, that it would have undermined the credibility, entire credibility of the government's case. Well, isn't the rest of the government's case based on essentially circumstantial physical evidence? The rest of the government? Is there any other credibility issue before the jury? Well, the credibility of the State's argument as to what inferences that they ought to draw from that other circumstantial evidence certainly would have been undermined if the person who was arguing to the jury about what they should and shouldn't speculate about is proven to them to be somebody who allows their witness to get up on the stand and lie to them and not correct it. That would indeed affect the State. So it's the NAPU claim. The NAPU claim and the Brady claim as well, Your Honor. Thank you, Your Honor. I reserve the rest of my time. Thank you. Good morning, Your Honors. May it please the Court, my name is John Anderson representing the State of Arizona and Doris Shiro has since been replaced by Director Ryan, so just for the heading. First, I'd like to start out, I'll address the Brady claim first. I think counsel has somewhat misstated the record regarding what the Arizona Supreme Court held. The Arizona Supreme Court said that, okay, looking at all the things that Duncan said, the most incriminating thing he said there was that he would deny being in Arizona. I didn't say that it was the most incriminating evidence possible. In fact, it found that Duncan's testimony was insignificant. As far as raising the refute claim, I would like to say. What did the Arizona Supreme Court say? The Arizona Supreme Court said that Duncan's testimony was insignificant. And when she talks about it saying it's the most incriminating piece of evidence, it's saying, okay, looking at that, the most incriminating thing that he said was regarding that statement. It didn't say it was significant. As a matter of fact, it said that all of Duncan's testimony was insignificant. And if you look at Duncan's testimony, it was ten pages out of a ten-page trial. And Duncan's statement about not being in Arizona was also, it was impeached itself by Detective Halterman. Detective Halterman pointed out that he hadn't heard anything significant from Duncan. And defense counsel pointed out in closing argument, well, that statement about Arizona was itself impeached by Halterman, who said that he didn't get anything significant from Duncan. As far as raising a refute claim, I'd like to point to the amended petition. And the amended petition, it does cite, cites Brady, and it cites Giglio, but Giglio, and it doesn't say anything about false testimony. It says, the undisclosed assistance the State provided Duncan and Duncan's status with the police of the former violated petitioner's rights. So it doesn't say anything about false testimony. And as I believe Judge Reimer has referred to, they haven't pointed out where Duncan's testimony was actually false, particularly with regard to he said he didn't receive any benefits. Well, what came out on cross-examination, defense counsel was able to bring out that he had at one point hinted around as the county attorney, well, sometimes people get help when they testify. And on redirect exam, the prosecutor brought out that, in fact, when he went back to California, he didn't get any special treatment. In fact, he got worse treatment because he was considered a snitch and put in more confined quarters. So I don't see that there is any false testimony to fall under the Pew example. The impeachment was certainly cumulative in this case. I mean, Duncan's extensive criminal record was brought out on cross-examination. That was certainly known. The jury already knew that whether or not Haltman, and Haltman did write a letter, as Judge Reimer pointed out, in the 1979 testimony was shown that that letter was introduced in the California hearing and evidently forgotten about. But defense counsel could have gone back and impeached him with that, and he didn't. But the point was that the jury knew that Duncan at least had a motivation of trying to get some help with his California sentences. He had gotten a letter or gotten indication that a letter was going to be written by Haltman, and he had approached the county attorney for possible help. And also, Detective Johnson testified that he had also gone to the county attorney's office and asked if anything could be done for. So as the State sees it, what was not before the jury? Well, what was not before the jury was the two letters by James, the counsel at the first trial. And those were letters from around the time of the first trial. So the jury did not know specifically about the letters from James to the California authorities, the first to the parole board, I believe, and the second to the judge. The jury didn't know that the letters had actually been written? Right. They didn't know that there were letters written. They knew that Duncan had asked the county attorney for some kind of help, but they did not, in fact, know about the letters. And those were the letters that came out first in the PCR hearing. One of them was discovered by PCR counsel after the court had already ruled, and then the second one was disclosed when the district court ordered our office to go through both files, and then there was the second letter from the court. Just as a matter of curiosity, why did Arizona not turn those letters over? You know, I have no idea, Your Honor. I mean, it's conceded, obviously, that they didn't turn them over, and that they would have had some, at least, favorable significance. It's just hard to understand why. Yeah, I can't speculate on that, Your Honor. I think that possibly there was a second prosecutor at the second trial. Well, possibly, but there was a second prosecutor. I mean, clearly, he has an obligation to know what is known to his department and to the police, at least, and his agency. Yeah, clearly we agree, Your Honor, that there was a Brady violation. And as you pointed out, Judge Reimer, besides the Supreme Court saying that Duncan's testimony was insignificant, the rest of the case was a circumstantial evidence case. There was plenty of evidence that he was in Arizona. In fact, his defense counsel conceded that he had been in Arizona, based on the fact that there were Arizona newspapers found in the Ford that had one ad circle that showed that he had been in the Phoenix area looking for a job on or about August 1st. Let me just check my notes for one second. But is it ñ but it is correct, is it not, that this testimony was the only link to Prescott? It was the only mention in Prescott, but our point would be that there was plenty of ñ the important point is tying Shadd to Groves, and there was plenty of evidence showing that, the fact that the special lawyeró Well, it was more than whether he was actually there. It was ñ the statement was, I'm going to deny that I was there. And that carries a certain implication, you know, of a knowledge of guilt. So the statement doesn't really depend purely on whether he was there. It was a denial that would have said to the jury, he's got something to hide. Sure. I think you're right, Your Honor. That's why the statement was introduced, to show a certain consciousness of guilt. Of course, it doesn't say anything about a murder. So that distinguishes some of these other cases, such as the Jackson case cited by opposing counsel, where the informants there said that the defendant went on in length about committing murders, and those were used to find a special circumstance to impose a death penalty. As a matter of fact, the State didn't even know at that point that anyone was dead. Larry Grove was just missing. Duncan didn't know that Larry Groves was murdered. And that's why Halterman testified when he, after he talked to Duncan, he said, well, did he give you anything significant? He said no, because the detective didn't even know that Prescott was important until Larry Grove's body was identified through FBI records in October. So the question really as to that issue is how significant is it? Is it material? As you said, that's really the issue. Is it material, or is it prejudicial? Okay. That's correct, Your Honor, if I don't mean to talk over you. And we cited the Hobie case as showing a case where the evidence isn't material. He was impeached in many ways. And I think the important thing is the jury knew. When you look at what was Duncan's motivation, I think it was very clear to the jury that Duncan had a motivation. One of his motivations, I mean, he testified to many motivations, but one of his motivations was to try to get some help with his California sentence. I mean, he's a career criminal. The jury knew that he's a career criminal. I mean, he doesn't come in here masquerading as a pure person. There was extensive evidence of his criminal record. As a matter of fact, even Wilma testified. I mean, he was impeached in so many ways. Wilma, Shad's girlfriend, testified that he was a drunk, that he smoked marijuana.  So what she wasn't supposed to do, the police didn't want him to do that. So I think he was impeached in very many ways. And his testimony truly was insignificant when you look at the overall case. If the Court doesn't have any more questions on the Brady issue, I'll proceed to the other issues. Okay. On the Eddings issue, counsel has cited Stiers. I think Stiers is distinguishable because if you look at Stiers, and I think one or at least two judges of this Court have pointed out, Stiers talks about particular language in the Arizona Supreme Court's opinion, and this is at page 1035 of this Court's opinion. It's particularly used to the word however. So it's looking at particular language in the Arizona Supreme Court's opinion. I would also point out that Stiers, there is a petition for cert pending. The reason it wasn't actually filed was because the Supreme Court asked us to file some additional documents, and so that is pending. And the reason it hasn't been acted on? The reason they point out in the reply brief that they say, well, there's no petition for cert filed. But what happened is we filed a petition for cert. One thing, we had some kind of defect in the form. So it wasn't actually filed. The Supreme Court doesn't actually file things until you clean everything up. I mean, until you get the booklet in the right form, you get all the right things. So it's actually been docketed as of May 4th. So that is still pending and we're hopeful for a reversal there. But I think Stiers is easily distinguishable because of the particular language. I think the presumption has to be that the Arizona courts are going to follow Eddings. I mean, they're not just duty-bound to follow their own law. They're bound to follow Supreme Court law, and they recognize that. The Arizona Supreme Court in state versus ring, the state court ring decision recognizes that in the supremacy clause you have to follow federal law, which the Arizona courts have done. And I would point out that there has been possibly some loose language in Arizona court opinions, but I've cited some authority that shows that in Pandela and these cases, they've explained that what we're talking about is if there's no nexus, it's not substantial mitigation. And the weight, and even in Eddings, the United States Supreme Court said that the weight is for the finer effect. And so, and in this case, for instance, Shad was 36 when he committed the murder, so his childhood circumstances wouldn't be considered as mitigating, although the problem was... When would they? If childhood circumstances can't be utilized to show that there was a background of violence and uncontrolled ability to, or inability to control one's actions. When, if that is not a link, then what is? Well, I think just the fact of having a bad childhood is a mitigating circumstance in and of itself. But to be more persuasive... No, but under the old law, I never understood how the nexus test worked exactly. You mean in Arizona, Your Honor? In Arizona, yeah. Yeah, well, how it works, I think it's always gone to whether or not it's a weighting circumstance. And because someone who's... If you're 19 years old, if you've had a horrible childhood, if your father's beaten you every day and you go out and commit a murder when you're 19, it's a much more weighty mitigating circumstance than if your father beat you when you're 18 and you commit a murder when you're 50. And that's how the Arizona Supreme Court has applied it. I mean, to adopt their view would almost be to assume that the Arizona Supreme Court has not followed Eddings ever since Eddings was issued, which isn't true. And I think in this case, certainly, the trial court considered the evidence. It said it considered the evidence. As the U.S. Supreme Court has said, when the state court says it's considered the evidence, you take it at its word. It found he had a bad childhood. It just found it wasn't persuasive, which is a weight determination. Do you know when that rule first appeared in Arizona law? I didn't cite it in the brief, but I think it's the first discussion of Eddings in the Arizona State v. Jordan, J-O-R-D-A-N. And I don't have a citation for that, but. Do you know what year it was? It was just after Eddings. It was maybe a year after Eddings. I mean, was it before or after the second trial? Oh, that would go back to, I should know when Eddings is, but. Eddings is 82. Yeah. I think the state of law was still in flux somewhat at that time. But the important thing is what happened in 85, and that was clearly the law in 85. And they point out, they try to argue that, well, somehow what the state represented in the PCR affects the determination, but that's not true because, one, the Attorney General's Office doesn't make the law, and, two, you look to what the trial court looked at when it was sentencing the defendant and what the Arizona Supreme Court looked at when it affirmed it on appeal. And so you already have, you already have those two decisions, so it doesn't make any difference. If it were the well-established rule in Arizona that you don't consider a certain type of evidence, don't you presume that a trial judge follows the law? Well, one, that's not the rule in Arizona, Your Honor. I think if there was, if there was, and you bring up. That's what I was trying to ask. I thought you said it was the rule. Yeah, and I think that, you know, that kind of gets into the Texas cases where the Texas courts had this goofy rule. Well, actually, maybe I shouldn't slander Texas, but they had this special circumstance. They had this special circumstance that the United States Supreme Court in Jurek kind of bent over backwards to try to say it allows for consideration. And finally they said, well, listen, these two special circumstances just don't allow for consideration of mitigation, the deliberateness factor and the dangerousness factor. And I think that's distinguishable from what Arizona has done. Arizona's rule goes to the weight, which is what the Supreme Court has said is all right. Well, okay, so where does that get you with respect to the argument that there should have been an evidentiary hearing? As far as the Eddings issue, I mean, the question is did the Arizona courts consider it properly, so I don't think there's any need for an evidentiary hearing there. On the ineffective assistance at sentencing issue, the trial court, and we do believe that this wasn't properly developed in state court, I'd like to make that point. The state court said that they just want another chance at the family, and they haven't presented anything from the family. They could have presented affidavits even from Shadd himself, but they didn't. Investigator Sheila Cahill later, she said she called up the mother and the mother hung up on her. The pre-sense report shows that his father was dead, so he wasn't going to get anything from his father. His mother wouldn't write him back, and his siblings wouldn't write him back. So that family and the state PCR proceeding lasted for some five years, and finally the trial court said they just, the defense just says they want another crack at the family, and they haven't been able to get anything from the family, and so there's nothing before this court would require an evidentiary hearing. On the Brady issue, the district court did allow, it ordered the record. Can you give me a cite to the record as to when they said we just want a crack at the family? Oh, as far as the, well, I'm talking about what the district court found. I'm talking about the district court. The state trial court. You're talking about the state trial court? Yes, Your Honor. Okay. If I can just have a second, I'll point out what it actually said. I have it. I understand what you're referring to now. Yeah. Yeah. It's at the ER-144-1445 where the court says the defendant is simply suggesting it would be a good thing now to delve further into defendant's prior convictions, which is just a different issue. And try once again to talk to the family members. Et cetera, et cetera. Right. Exactly. And the claim has no merit. Is it the last sentence of that paragraph? Well, I mean, they're saying yes is the answer to that. Yes, Your Honor. That is my answer, Your Honor. The claim has no merit, but also they haven't presented anything under Rule 32.6. They didn't present any affidavits. They're wanting to go on a fishing expedition. When you use that fishing expedition language, you're talking about, well, there's no evidence before this court to do anything at this time. So as far as the, I guess, getting back to the Brady claim, it should have been disclosed. I mean, that's clear. There was a Brady violation. Well, that's the same issue as the other, isn't it? Is it prejudicial or is it material? Yeah. And, you know, assuming these letters should have been disclosed by the material, which I guess I've already discussed, and based on this record, this Court has the two letters from James to the California authorities. It knows about the Halteman letter. The defense has added additional proceedings from California, some of which are after the 1985 trial. They put them in their excerpts of record. They weren't presented to the State court. But those weren't concealed by the prosecution. The State didn't conceal California records. So it really goes to the letters from James, and this Court can evaluate that based on the current record. Is your argument any different than it is with Napoo here? I mean, isn't it the same argument? Well, not a little bit different, Your Honor. I mean, as far as prejudice or materiality. Yeah. There's some indication from this Court, I think, in Jackson, that there's a different standard for materiality on ñ slightly different standard for materiality on Napoo claims. Napoo claims, it's a slightly different standard for materiality. But to answer your question, yes, it's basically the same argument. It's not material. And as this Court found in the Hovey opinion, it's not material for the same reasons on both the Brady and Napoo claims. Well, I'm ñ which is a higher standard, Napoo or Brady? I guess it depends which parties you're looking at. Napoo requires a lesser showing of materiality than Brady. But once again, that goes back to our argument that there's not actually any false testimony. And I guess the question is ñ Well, that's a different argument. In Napoo, you said it comes down to materiality. Here you're saying that ñ Well ñ When you say there's no false ñ Oh, I'm sorry. I think that ñ yeah, I see where I wasn't clear. But with regard to Napoo, we've argued that there was no false testimony. Now, when he says he didn't get any benefit, it's a matter of interpretation, which was brought out on cross-examination. When he says he didn't get any benefit, he's thinking, well, you know, I went back to California and I got worse treatment. So he's saying I didn't get any benefit from that. He's also talking about Halterman's letter. He said, well, I don't know if he wrote the letter or not. So they're saying that he's lying about that. But it's ñ What are you talking ñ what part of the record are we talking about now? I don't even know what question you're talking about. I'm sorry. We're talking about ineffective assistance of counsel. What are you talking about? I don't know. I know he's talking about Brady. I don't know what we're talking about. Okay. I'm sorry. I don't know. You were discussing ñ I was just wondering. Maybe the Court could ask a question and get me back. Are we talking about ñ You're discussing Brady. Okay. Okay. I see where I've left the board in the wilderness. You switched subjects. I thought we were talking about ineffective assistance of counsel. Are we back to Brady? I think the Court had asked a question about whether or not there should have been an evidentiary hearing. So I was trying to cover all the evidentiary hearing points, which I guess ñ And we're now on Brady. Is that right? If you want to be there ñ I don't know. I don't want to be anywhere. I was trying to find ñ when you were talking, I thought you said now about Brady. And then you were sort of ñ you said there's a difference between materiality and Brady and the Pooh, which caused me to say, out of intellectual curiosity, what was the difference. But as I understood it, I mean, you talk about whatever you'd like to talk about. Okay. But I thought you were talking about Brady. Is that right? Yes. I was talking first about the ñ The evidentiary hearing, whether or not there needed to be an evidentiary hearing. That's where you started. That's where I started. Yes. And then I heard you say, how about Brady? They always urge you at seminars to draw a roadmap, and obviously I've done a bad job of doing that. But, yes, I was getting back into the merits of the Brady-Napoo claim. And the one thing I hadn't addressed yet is ñ really is the jumping to another point, unless the Court has questions or wants me to slow down. The ineffective assistance of counsel. Counsel, this isn't like Lambright, where there's one witness and a two-page memorandum. This was a case where Charles Anthony Shaw, the defense attorney, filed a 39-page sentencing memorandum that raised 13 mitigating circumstances. He presented 14 witnesses to show that Shad is a good man. He gets along with people like him. He's done great in prison. He's a model prisoner. He's not dangerous. He also attacked the Utah prior conviction, saying it was just an accident, which is the opposite of ROMPILA. If you remember the U.S. Supreme Court's ROMPILA decision, the defect there was that defense counsel had not looked at the aggravating circumstance and investigated the aggravating circumstance. In this case, defense counsel went at length into the Utah prior conviction to show that it was truly an accident or make the argument that it was an accident. So this is the opposite of ROMPILA. This wasn't ineffective assistance. Counsel reasonably chose to try to present the point that he's a good man and didn't ñ and he presented evidence of a bad childhood, but he reasonably chose not to emphasize it because if he would have argued that he was made crazy or dangerous by this bad childhood, it would have undermined his argument that this is a good man who deserves a life sentence. And that was the reason. I found in the district court's explanation, I found it somewhat confusing. At times he was arguing that it was inconsistent, and that's why he didn't do it. And then at other times he was saying, look, he did do it, and what a good job he did on proving that he had a terrible childhood. I wasn't sure what the district court said. Well, I think what the district court said was it's dangerous. As this Court, I think it was in the Gerlau decision, this Court said that it's a two-edged sword. It can be a two-edged sword. If you emphasize one kind of mitigation, it can undermine your primary thrust. But counsel, in accord with this Court's decision, presented it all. Now, that he chose to emphasize some over the other doesn't show that he's ineffective counsel. That's what counsel do when they choose. Well, I read the testimony of Dr. Bentheim, and it is the most cursory discussion of a very serious subject of the relationship between a miserable childhood and a criminal act, violent criminal act, that one can imagine he talked to him for two, he met with him twice. Yes, that's correct. Now, you say that it would have been inconsistent to develop this, some kind of psychological evidence. But how can we say that if we don't have any, if we haven't had any kind of hearing and don't understand what the evidence really was and why it wasn't put on and what the reasons for the inability to put it on in the State habeas proceedings were? Well, first, as Judge Reimer pointed out, I think counsel's strategy is apparent from what he did. Secondly ---- Well, it may not be apparent to all of us. Okay. I'll take that as a given. This court also has Dr. Sanislaw's 98-page affidavit, which the district court alternatively considered. And, I mean, it's exhaustive. But it doesn't say that he's ---- if you look at the end of, if I have it here, Dr. Sanislaw's declaration, it's fairly equivocal. The conclusion is, I've got ER 546, 547. Exhibited many symptoms of a chronic mental illness. He has defeating behaviors. His behavior is consistent. But it doesn't say that he has ---- it doesn't issue a medical opinion that he has a mental illness. So I think the district court did an exhaustive job of going through Sanislaw's declaration and saying why, even if it had been presented to the state court, it wouldn't have made a difference. And I think the record's clear. Counsel did. It wouldn't have done counsel any good to try to go to the family because Sheila Cahill, an investigator, tried to talk to the mother. She hung up on Cahill. Even Wake's affidavit points out that in the past they've tried to talk to the family and investigators have tried to talk to the family and the family had not been responsive. So that was in 85. That was much later on. So trial counsel, if it would have tried to get something from the family, there was nothing there to get. I hope I haven't confused the court too much this morning. If there are no further questions, I would respectfully ask this Court to affirm the judgment of Justice Clark. Do you have a question? All right. There don't appear to be any further questions. Thank you. I know I don't have much time left, Your Honor, so I'll start first with the Nabu claim and the fact that this Court has held the prejudice is virtually automatic once false testimony is shown. John Duncan testified he received no special treatment and was actually treated worse. The evidence would show that he was put in protective custody at his request and at the request of Janes, who wrote to the court and asked for protection for Mr. Duncan at his request. So, indeed, he did receive special treatment and his denial of that was false, and that's why we need a hearing. The fact that he was impeached some, as this Court held in Carragher, is not good enough when there's additional, more powerful evidence. And as this Court held in Jackson v. Brown, promises made by prosecutors carry much greater weight than promises made by police officers when a jury is weighing credibility. The prosecutor in this case thought Duncan was material and important. Those were his words. He put Duncan on because he needed him to get the statement from Shadd. ER 174 is the citation I was discussing earlier about the Supreme Court opinion. You can look at it and determine for yourself whether I'm misstating the record. I am not. With respect to the ineffective assistance of counsel claim, counsel is not excused from their duty to conduct a thorough investigation simply because it's hard. Doing death penalty work is hard. You have a duty to conduct your investigation, and when family members don't want to talk to you about their child, who is on trial for his life, then that ought to set off sirens that you need to conduct an investigation. 1983, State v. Gretzler, and 1984, State v. Claiborne, is the first time that the nexus requirement appears in Arizona law, Your Honor. And I apologize for those citations not being in our brief. What year did you say that was? 1983, and again in 1984. And that's where they begin their discussion about this difference between age and the proffered mitigation. And the opinion cited by the State, Hoskins, talks about the requirement. And when that requirement is an across-the-board requirement that reduces, without an individualized determination, the weight that the evidence can be given by a trial judge because of State case law, that is what Justice Stevens, in his opinion, and Abdul Kabir said is unconstitutional. For all of the reasons in our briefs, and I apologize for speaking so quickly, but for all the reasons in our briefs and those in the record, Your Honors, the Court, at the very least, will entitle to a remand for an evidentiary hearing to answer all of the questions that the Court has here today with respect to Brady and with sentencing, or in the alternative, to simply reverse the unconstitutional sentence. Thank you. Don't go away. Now that your time is up, I wanted to ask you a question. Yes, sir. Do you always speak so quickly or is it because you have a limited time? A little of both. When I get excited, I speak quickly. Well, you did get a lot of words in. Thank you. The case just argued is for decision that concludes our calendar for this morning. The Court stands adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned. The Court is adjourned.
judges: Schroeder, Reinhardt, Rymer